FILED

2016 Sep-19  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **HEATH JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  1:14-CV-467-VEH** |
| | ) | |
| **THE CITY OF HEFLIN,** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Heath Jones ("Mr. Jones") initiated this retaliatory discharge case arising under Title VII of the Civil Rights Act of 1964 against Defendant City of Heflin (the "City") on March 17, 2014. (Doc. 1). Mr. Jones claims in his lawsuit that the City fired him as a police officer in retaliation for:  (i) refusing to falsely report to the husband of a female police officer who had sued the City for gender discrimination that his wife was having an affair; and (ii) supporting that female police officer's allegations of gender discrimination, including offering to be a witness in her case. The rather bizarre set of facts further reveal that Mr. Jones has, for a number of years, been living with a convicted felon and his refusal to end that

relationship is the reason the City has given for his firing. The retaliatory twist is that, according to Mr. Jones, his supervisor was aware of the relationship he and his ex-con fiancée had at the time of his hiring and it had never been a job-ending issue until Mr. Jones refused to make the false-affair report sought by the same supervisor.

Pending before the court is the City's Motion for Summary Judgment (Doc. 18) (the "Motion") filed on December 10, 2015. The parties have briefed and filed evidence relating to the Motion, including additional briefing that was ordered (Doc. 29) by the court on July 19, 2016. (Docs. 19, 24-25, 32, 33). The Motion is now under submission and, for those reasons explained below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "Once the moving party

has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

### B.     Title VII Retaliation

Title VII prohibits "[r]etaliation against an employee who engages in statutorily protected activity." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). The Supreme Court originally established the basic allocation of burdens and order of proof in a Title VII disparate treatment case in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). When relying upon circumstantial evidence[1] "[a] plaintiff establishes a *prima facie*

---

[1] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate [or retaliate] . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)). In opposing summary judgment, Mr. Jones does not contend that direct evidence of retaliation exists in this case.

case of retaliation by showing that:  (1) []he 'engaged in statutorily protected activity'; (2) []he 'suffered a materially adverse action'; and (3) 'there was a causal connection between the protected activity and the adverse action.'" *Gate*, 683 F.3d at 1258 (quoting *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010)); *see Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006) (broadening the scope of actionable Title VII retaliation to include not only job-related adverse actions, but also materially adverse conduct taking place outside of work); *see also id.* (defining material adversity to mean "that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination").

Statutorily protected activity triggering coverage under Title VII's antiretaliation provision comes in two forms–opposition-based or participation-based conduct.[2] More specifically, "[a]n employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d

---

[2]  Mr. Jones's complaint suggests that he engaged in both types of protected activity.

1346, 1350 (11th Cir. 1999) (on petition for rehearing) (citing 42 U.S.C. § 2000e-(3)(a)).

Under binding Eleventh Circuit precedent:

[A] plaintiff can establish a *prima facie* case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. <u>A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.</u>

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a *prima facie* case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), *cert. denied*, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis by

underlining added).

Concerning the broad coverage afforded under the participation clause the

Eleventh Circuit has explained:

> Congress chose to protect employees who "participate[ ] in *any* manner"
> in an EEOC investigation. 42 U.S.C. § 2000e-3(a) (emphasis added).
> The words "participate in any manner" express Congress' intent to
> confer "exceptionally broad protection" upon employees covered by
> Title VII. *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998,
> 1006 n.18 (5th Cir. 1969). As we pointed out in *Merritt v. Dillard Paper
> Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997), "the adjective 'any' is not
> ambiguous.... [It] has an expansive meaning, that is, one or some
> indiscriminately of whatever kind.... [A]ny means all." (internal
> quotations and citations omitted). Because participation in an
> employer's investigation conducted in response to a notice of charge of
> discrimination is a form of participation, indirect as it is, in an EEOC
> investigation, such participation is sufficient to bring the employee
> within the protection of the participation clause.

*Clover*, 176 F.3d at 1353.

Finally, as a divided Supreme Court held, Title VII retaliation requires proof

of customary but-for causation, rather than the less burdensome motivating-factor

standard applicable to Title VII discrimination claims:

> Based on these textual and structural indications, the Court now
> concludes as follows: Title VII retaliation claims must be proved
> according to traditional principles of but-for causation, not the lessened
> causation test stated in § 2000e-2(m). This requires proof that the
> unlawful retaliation would not have occurred in the absence of the
> alleged wrongful action or actions of the employer.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, __ U.S. __, __, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013) (emphasis added); *cf. id.*, 133 S. Ct. at 2522-23 ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act."); *id.* at 2523 ("It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

## C.   Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard." *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517, 139 L. Ed. 2d. 508 (1997). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under

an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* FED. R. EVID. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." Perry, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee an appealing party relief from an adverse final judgment. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" in order for reversible error to occur.

## III.   FACTUAL BACKGROUND[3]

In February of 2010, Mr. Jones, began a relationship with Constance Scott ("Ms. Scott") while he was working as a law enforcement officer for the Alabama State Alcohol Beverage Control ("ABC") Board. AF No. 2.1.[4] Ms. Scott's criminal

---

[3]  This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007) (observing that "a summary judgment proceeding . . . by definition involves no findings of fact . . . ."). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[4]  The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that Mr. Jones has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under Appendix II of the court's uniform initial order (Doc. 3) entered on March 18, 2014, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). Further, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17).

history for the time period between 2003 and 2008 consisted of six felonies, nine misdemeanors, and numerous traffic offenses. AF No. 1.1. More specifically, Ms. Scott's felony convictions, more specifically, included two counts of first degree theft (five years apart), second degree theft, second degree forgery, fraudulent use of a credit card, and possession of a forged instrument. AF No. 1.2. After the ABC Board discovered Mr. Jones was living with a convicted felon, it decided it would transfer him to Mobile. AF No. 2.2. Mr. Jones resigned from the ABC Board instead of giving up his relationship with Ms. Scott. AF No. 2.3.

Mostly through the efforts of his childhood friend, Captain A.J. Benefield ("Captain Benefield"), the City of Heflin Police Department (the "HPD") hired Mr. Jones as a police officer. AF No. 3.1. Mr. Jones was eventually promoted to lieutenant and Captain Benefield was made acting chief of the HPD. AF No. 3.2. During the events made the basis of this lawsuit, Mr. Jones was one of the highest

---

Consequently, whenever Mr. Jones has inadequately asserted a dispute over a fact that the moving party has otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports the factual assertion made by the moving party, has accepted that fact. On the other hand, whenever Mr. Jones has adequately disputed a fact offered by the moving party, the court has reviewed the evidence cited by Mr. Jones and, if it in fact fairly supports Mr. Jones's factual assertion, has accepted Mr. Jones's version. The court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of the moving party's undisputed statement of facts as set forth in Doc. 19 and responded to by Mr. Jones in Doc. 24. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Mr. Jones statement of additional facts contained in Doc. 24 and responded to by the moving party in Doc. 28. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 2.1) would indicate the first sentence of paragraph number 2 of the moving party's statement of facts is the subject of the court's citation to the record.

supervisory officers of the HPD, second only to Captain Benefield. AF No. 3.3.

HPD policy (that was never formally passed by the City Council, but nonetheless followed as personnel policy according to former police chief Robert Pittman's ("Mr. Pittman") and Mayor Rudy Rooks's ("Mayor Rooks") testimony at Mr. Jones's termination hearing (Doc. 18-19 at 13-14 at 48-49; *id.* at 15 at 54))[5] required officers to "conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the [HPD]" and that "[u]nbecoming conduct shall include that which tends to bring the [HPD] into disrepute or reflects discredit upon the person as a member of the [HPD]." AF No. 4.1. The policy also stated officers "shall avoid regular or continuous associations or dealings with persons whom they know are ... suspected felons." AF No. 4.2. Finally, all officers are required to swear upon graduation from the academy they will keep their private life "unsullied as an example to all and will behave in a manner that does not bring discredit to [the officer] or [his/her] agency. AF No. 4.3.

Mr. Jones was the superior officer of Susan Young ("Officer Young"). AF No. 5.1. In a March 8, 2011, response to a critical evaluation by Mr. Jones, Officer Young indicated that she believed (i) that she suffered injustice at the hands of Mr. Jones and

---

[5]  All first page references to Doc. 18-19 correspond with the court's CM/ECF numbering system.

the HPD, (ii) that "Jones is over zealous 99% of the time," (iii) that Mr. Jones set her up for failure, (iv) that Mr. Jones was deceitful and mean to her, (v) that "the whole time [she] worked with Jones he was just trying to gather dirt on [her]," and (vi) that "not being able to find any dirt, [Jones] settled for making [her] look and sound like an incompetent police officer." AF No. 5.2.

On February 28, 2012, Officer Young filed a federal lawsuit against the City, alleging Title VII gender discrimination and other claims. AF No. 6.1. Officer Young asserted in her lawsuit that she was treated less favorably than one of the HPD's male officers–Josh Horn ("Officer Horn"). On May 16, 2012, Officer Young amended her initial disclosures to identify Mr. Jones as an adverse witness. AF No. 6.2. Specifically, her disclosure stated that Mr. Jones "made untrue statements about [Officer Young's] training and performance" in his capacity as her superior officer. AF No. 6.3.

When being questioned by Captain Benefield about the merits of Officer Young's lawsuit, Mr. Jones claims that he corroborated her contention that Captain Benefield treated Officer Horn better than her "with respect to substantially similar conduct." (Doc. 25-3 at 3).[6] The date on which this conversation took place is not evident from the record. Captain Benefield was deposed on December 5, 2012, as part

---

[6] All page references to Doc. 25-3 correspond with the court's CM/ECF numbering system.

of Officer Young's Title VII lawsuit. AAF No. 15.

Mr. Jones claims that a few days after Captain Benefield gave his deposition, while working school traffic at Cleburne County High School in early December 2012,[7] Captain Benefield, angry about the gender-discrimination lawsuit brought by Officer Young, instructed Mr. Jones to call Officer Young's husband and tell him that Officer Young was having an affair. AAF No. 16.[8] According to Mr. Jones, Captain Benefield complained that Officer Young had caused him and his family a lot of pain and that she needed to feel some pain herself. AAF No. 16. During this exchange, Captain Benefield became upset because Mr. Jones would not do as he was instructed and brought up Mr. Jones's relationship with Ms. Scott, saying, "I've covered you on the Connie thing." AAF No. 16.

On December 7, 2012, Ms. Scott rode in Mr. Jones's patrol car during the City Christmas parade. AF No. 11.1. In the days following, Captain Benefield received more than one anonymous call criticizing the City for allowing officers to live with

---

[7] The record does not reflect the specific day in December on which this occurred. The court takes judicial notice that December 5, 2012, fell on a Wednesday. Consequently, a reasonable jury could find that Captain Benefield made this demand to Mr. Jones on or around Friday, December 7, 2012, or Monday, December 10, 2012.

[8] The City has responded to several additional facts (¶¶ 11-14, 16-18) offered by Mr. Jones that "[Captain] Benefield testified that these conversations about [Officer] Young did not occur." (Doc. 28 at 5). This type of credibility determination cannot be resolved in favor of the City on summary judgment and the court accepts Mr. Jones's version of what occurred. *See also* the court's evidentiary rulings discussed *infra*.

felons and allowing felons to ride in patrol cars during the Christmas parade. AF No.

11.2. Captain Benefield deduced that the felon being referred to in these calls might

be Ms. Scott. AF No. 11.3.

Captain Benefield confronted Mr. Jones about the anonymous calls. AF No.

12.1. Mr. Jones told Captain Benefield that Ms. Scott had only been in criminal

trouble from an incident with her ex-husband's girlfriend at a football game, that the

charges were dismissed, and that someone from the HPD was probably just trying to

cause trouble. AF No. 12.1. Captain Benefield took Mr. Jones at his word. AF No.

12.2.

On Friday, December 18, 2012, Officer Eric Winslett ("Officer Winslett"), who

was in charge of doing warrant checks on the criminal computer database, returned

to work after a two week absence. AF No. 14.1. Officer Winslett performed a criminal

background check on a social security number left in the area for warrant checks,

determined the identify of the number was for Ms. Scott, and discovered her

numerous felony and misdemeanor convictions. AF No. 14.2. On Monday, December

31, 2012, Captain Benefield provided the criminal information about Ms. Scott to Mr.

Jones and told him that, in his opinion, Ms. Scott's continuing to live in Mr. Jones's

home constituted conduct unbecoming of an officer under the above HPD policy. AF

No. 15. Mr. Jones responded that he needed two weeks to end his relationship with

Ms. Scott. AF No. 16.1. Captain Benefield agreed to give Mr. Jones until January 14, 2013, to do that. AF No. 16.2.

On 3:20 p.m. the following Monday, January 7, 2013, Captain Benefield sent Mr. Jones a text message, asking "what's the status on what we talked about last Monday?" AF No. 17.1. Mr. Jones responded that the situation was "in the process of being handled ... on schedule as we talked about for the coming Monday," which was January 14, 2013. AF No. 17.2. On January 8, 2013, at 6:49 p.m., Mr. Jones texted Captain Benefield, stating that Ms. Scott had left that night and taken some of her stuff to her mother's house. AF No. 18.1. He also texted Captain Benefield, "thank you for standing up for me." AF No. 18.2.

On January 9, 2013, Ms. Scott scheduled a meeting with Mayor Rooks to try to get Mayor Rooks to get Captain Benefield to change his mind. AF No. 19.1. The meeting started at 3:37 p.m. with Mr. Jones, Ms. Scott, Mayor Rooks, and Captain Benefield present. AF No. 19.2. Unbeknownst to Mayor Rooks or Captain Benefield, Mr. Jones and Ms. Scott were recording the meeting. AF No. 20.1.

By far, Ms. Scott did most of the talking during the meeting. AF No. 21.1. She admitted to the felony convictions, but claimed that they should not matter because she was no longer involved in criminal activity and she was not a bad person. AF No. 21.2 Ms. Scott also admitted to calling Mr. Jones at work and telling him she would

blow her brains out if he did not come home. AF No. 22.

After listening to Ms. Scott and Mr. Jones for some time, Captain Benefield stated that it was inappropriate for an officer to be living with a felon, that it was an embarrassment to the HPD, that his stance was grounded in his interpretation of HPD policy, that he had to look out for the whole HPD and not just Mr. Jones, and that he was not going to change his mind. AF No. 24.1. Captain Benefield further stated that Mr. Jones's options were either for Ms. Scott to move out and not date Mr. Jones, for Mr. Jones to leave the HPD, or for Mr. Jones to be terminated from the HPD. AF No. 24.2.

Mayor Rooks stated that he was not going to override Captain Benefield's decision, that he had to maintain the integrity of the HPD, that the HPD had to be looked at as professionals, and that Ms. Scott's living with Mr. Jones would cause a hardship on the HPD. AF No. 25. After Ms. Scott was repeatedly told that Captain Benefield and Mayor Rooks would not change their minds, Ms. Scott stated that she would move out to protect Mr. Jones's career. AF No. 26. Mr. Jones and Ms. Scott asked for more time for Ms. Scott to move out, and Mayor Rooks and Captain Benefield agreed to extend the deadline two-and-a-half more weeks until February 1, 2013. AF No. 27. However, Captain Benefield told Mr. Jones that if he did not abide by the new deadline that he would be terminated. AF No. 28.1. Not once during

15

this lengthy meeting did Ms. Scott or Mr. Jones insinuate, much less state, that Captain Benefield was retaliating against Mr. Jones for supporting Officer Young and refusing to retaliate against her. AF No. 29.

On January 24, 2013, Mayor Rooks attended a mediation in Officer Young's case and was told by Officer Young's attorney that an unnamed HPD officer had approached her, wanting to testify on behalf of Officer Young. AF No. 31.

On February 1, 2013, Captain Benefield saw Ms. Scott's vehicle parked at Mr. Jones's house on his way into work. AF No. 32.1. After not reaching Mr. Jones by phone, he sent text messages at 9:41 a.m. for Mr. Jones to call him. AF No. 32.2. Mr. Jones called Captain Benefield back within a few minutes. AF No. 33.1. Captain Benefield reminded Mr. Jones of the deadline and asked Mr. Jones to meet with him at Mayor Rooks's office later in the day to tell them what he was going to do. AF No. 34.1. Mr. Jones asked if they could meet on February 4, 2013, and Captain Benefield said "no" because that was the day everyone agreed upon. AF No. 34.2. Mr. Jones asked whether his attorney could be present, and Captain Benefield said "yes." AF No. 34.3.

By 1:36 p.m. on February 1, 2013, Mr. Jones still had not called Captain Benefield, so Captain Benefield called him again. AF No. 35.1. Mr. Jones indicated to Captain Benefield that he had not yet spoken with his attorney and could not speak

for him as for a meeting time. AF No. 35.2. Captain Benefield then asked Mr. Jones whether Ms. Scott was moving out. AF No. 35.3. Mr. Jones stated that Ms. Scott was not moving out and that he was not resigning. AF No. 35.4. Captain Benefield told Mr. Jones that they needed to meet on the following Monday, February 4, 2013, and that he needed to know what time Mr. Jones's attorney could meet. AF No. 35.5. Mr. Jones asked Captain Benefield if he had read Mr. Jones's attorney's letter, and Captain Benefield stated that he had not seen any letter. AF No. 35.6.

Starting at 3:25 p.m. on February 1, 2013, Mr. Jones began sending Captain Benefield a total of eighty-five text messages, which appeared to Captain Benefield to be parts of a letter from Mr. Jones's lawyer. AF No. 36. Captain Benefield called Mayor Rooks and asked if he had received a letter from Mr. Jones's attorney, and Mayor Rooks told him he had received an electronic copy of a letter from Mr. Jones's lawyer dated January 31, 2013. AF No. 37.

The two-page letter dated January 31, 2013, addressed to Mayor Rooks and Patrick Casey, Esq. states in part that:

> In early December 2012, just a few days after Benefield's deposition was scheduled (and partially taken) in the Young case, while working school traffic at the Cleburne County High School, Benefield ranted to Lt. Jones that Ms. Young had caused him and his family a lot of pain and said she needed to feel some pain herself. Benefield then instructed Lt. Jones to take retaliatory action against Ms. Young by calling her husband and telling him she was having an affair. Lt. Jones

immediately made it clear that he would not be involved in such conduct and that, to his knowledge, such an accusation was false.

Almost immediately thereafter, Benefield began to repeatedly threaten Lt. Jones' job which he has continued to do as recently as January 9th when he explicitly stated he planned to recommend Lt. Jones' termination. Notably, this last threat was made in the presence of not only Lt. Jones but also Ms. Scott and Mayor Rooks.

(Doc. 18-15 at 2-3)[9]

Mr. Jones testified regarding his recollection of this exchange with Captain Benefield concerning Officer Young:

Q.    So, at what point in time did you feel like your job was in jeopardy?

A.    Whenever I wouldn't -- the day that we were at the school doing school traffic, when he asked me to make that anonymous phone call to Susan Young's husband and I told him, no. And then I hem-hawed like I might, just to try to buy time. And he -- he told me, he says, I have covered for you on Connie[, *i.e.*, Ms. Scott].

(Doc. 18-2 at 42 at 161).[10]

On February 4, 2013, Mayor Rooks and Captain Benefield met with the City's Personnel Committee and they recommended Mr. Jones's dismissal from the HPD on account of his living with a convicted felon, but the Committee did not make a decision at that time. AF No. 40. There is no evidence in the record that the Personnel

---

[9]  All page references to Doc. 18-15 correspond with the court's CM/ECF numbering system.

[10]  Any first page references to Doc. 18-2 correspond with the court's CM/ECF numbering system.

Committee was made aware of Mr. Jones's claim of retaliatory conduct when Mayor Rooks and Captain Benefield made this joint recommendation.

On February 6, 2013, at 6:34 p.m., Mr. Jones called Mayor Rooks in response to an earlier voice mail message left by Mayor Rooks. AF No. 41. Mayor Rooks told Mr. Jones that the Personnel Committee was in session and they wanted to hear his side of the story. AF No. 42.1. Although Mayor Rooks told Mr. Jones that it was not a due process hearing, Mr. Jones refused to meet with the Personnel Committee without his attorney present, even though Mayor Rooks begged him to come in and talk. AF No. 42.2.

Although he would not talk to the Personnel Committee, Mr. Jones agreed to meet Mayor Rooks and City Clerk Shane Smith a few minutes later at City Hall. AF No. 43.1. Mayor Rooks again begged Mr. Jones to meet with the Personnel Committee, which was still in session, they could hear his story, and Mr. Jones again refused. AF No. 43.2. At the end of their meeting, Mayor Rooks handed Mr. Jones a letter that placed him on administrative leave with pay, pending suspension or termination, and that informed him he would be terminated if he did not request a hearing before the City Council in ten days. AF No. 44; (*see also* Doc. 18-16 at 2

("Notice of Suspension/Termination – Lamar Heath Jones")).[11] The letter listed two reasons for the adverse action:

•       Conduct Unbecoming of a Police Officer

•       Not following Law Enforcement Code of Conduct

(Doc. 18-16 at 2).

On February 7, 2013, Officer Young served a third supplement to her initial disclosures that completely changed Mr. Jones's adverse witness status; now Mr. Jones and Ms. Scott were disclosed as supporting witnesses for Officer Young. AF No. 45. In this disclosure, Officer Young's lawyer certified that she had "only become aware of the above referenced subjects of knowledge within the last 30 days." AF No. 47. While Mr. Jones never talked directly to Officer Young about his anticipated testimony, he testified that he shared with her lawyer in December 2012 his belief that Officer Young had been treated unfairly. AF No. 46.1.

Mr. Jones admitted in his deposition that he never told any City employee or official that he called Officer Young's attorney, that Captain Benefield allegedly told him to call Officer Young's husband, that he supported Officer Young, or that he allegedly felt he was being retaliated against before his attorney's January 31, 2013,

---

[11]  All page references to Doc. 18-16 correspond with the court's CM/ECF page numbering system.

letter was sent to the City. AF No. 48.

On February 15, 2013, Mr. Jones hand-delivered to Mayor Rooks his written request for a hearing before the City Council. AF No. 49.1. Mr. Jones told Mayor Rooks that Captain Benefield was retaliating against him. AF No. 49.3. Mayor Rooks responded by stating that Mr. Jones never told him that before he received his attorney's letter. AF No. 49.3.

On February 22, 2013, Mr. Jones was served with a notice of hearing. AF No. 50. On March 19, 2013, a termination hearing was held before the City Council. AF No. 51.1. Mr. Jones's attorney appeared and defended Mr. Jones, who was present. AF No. 51.3. After the City presented evidence supporting its grounds for termination, Mr. Jones's attorney cross-examined Captain Benefield. AF No. 52.1. Captain Benefield conceded that Mr. Jones had the best arrest statistics in the HPD and was a good officer; however, he testified that Mr. Jones had the worst emotional state of all his officers. AF No. 52.2.

Mr. Jones's attorney called Mr. Pittman as a witness. AF No. 53. Mr. Pittman testified that he "would be concerned" about a ranking officer's association with a convicted felon having a criminal background comparable to Ms. Scott. (Doc. 18-19 at 19 at 72). Mr. Pittman further indicated that he would focus on whether that person would be "in a position of having or being currently involved in any type of criminal

activity, ongoing criminal activity or involvement with people with criminal backgrounds." (Doc. 18-19 at 20 at 73). Mr. Pittman additionally opined that, "[i]f there was nothing there to give indication that this was an ongoing criminal activity or criminal involvement on that person's part, then I would really have to balance that information with a right to association, which every officer has[.]" (*Id.* at 74). The City has characterized Mr. Pittman's testimony to mean that the decision to enforce this association-based HPD policy is a subjective one. (*See* Doc. 19 at 13 ¶ 53 ("[I]t is a judgment call whether an officer living with a felon is grounds for termination.")).

The focus of the hearing was largely limited to the validity of the charges brought against Mr. Jones for violating HPD policy. (*See generally* Doc. 18-19 (transcript of termination hearing)). While Mr. Jones's counsel attempted to ask some questions about his client's retaliation allegations, those efforts were essentially stymied. (*See generally* Doc. 18-19 at 11-13 at 38-45). At the end of the hearing, the City Council stated that they wanted to hear from Mr. Jones, but Mr. Jones declined to speak, on the advice of his attorney. AF No. 54. The City Council voted 5-1 to terminate Mr. Jones on the charges asserted. AF No. 55. The minutes summarizing the City Council's meeting held on March 19, 2013, makes no mention of, much less

a finding about, Mr. Jones's claim of retaliation. (Doc. 32-1 at 2).[12]

Mayor Rooks testified that he and Captain Benefield were the decision-makers who recommended Mr. Jones's termination. AAF No. 39. The City does not contest that Mr. Jones's employment was terminated on March 19, 2013, as a result of the recommendation that Captain Benefield made to Mayor Rooks.[13] AAF No. 38.

## IV.   ANALYSIS

### A.   Mr. Jones Has Established a *Prima Facie* Case of Retaliation.

#### 1.   Mr. Jones Has Shown Sufficient Protected Activity in Opposing Retaliation Against Officer Young.

COH contends that Mr. Jones's retaliation claim is facially deficient for two reasons–he cannot show cognizable protected conduct in the form of opposition or participation and he cannot demonstrate causation. (Doc. 19 at 14). The court addresses the sufficiency of Mr. Jones's protected activity evidence first.

In its initial brief, the City contends that "[i]t is undisputed that Jones never opposed any of the City's employment practices . . . until 1/31/13, the date his attorney sent his letter to the City." (Doc. 19 at 15). However, reading the record in

---

[12] All page references to Doc. 32-1 correspond with the court's CM/ECF numbering system.

[13] *See also* discussion of final decision-making authority under Ala. Code § 11-43-81, *infra*.

the light most favorable to Mr. Jones, which the court must do on summary judgment, a reasonable jury could conclude that Mr. Jones's negative reaction to and decision to disregard Captain Benefield's directive in or around December 7, 2012, to anonymously contact Officer Young's husband and report that she was having an affair because of all the pain she had caused him with her gender-discrimination lawsuit, are sufficient to satisfy the opposition clause.

The court reaches this conclusion after studying the cases relied upon by the parties in their briefs. In *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 277, 129 S. Ct. 846, 851, 172 L. Ed. 2d 650 (2009), the Supreme Court declined to adopt the Sixth Circuit's more narrow view on the scope of cognizable Title VII opposition:

> The Sixth Circuit thought answering questions fell short of opposition, taking the view that the clause " 'demands active, consistent "opposing" activities to warrant ... protection against retaliation,' " 211 Fed. Appx., at 376 (quoting *Bell*, *supra*, at 610), and that an employee must "instigat[e] or initiat[e]" a complaint to be covered, 211 Fed. Appx., at 376. But though these requirements obviously exemplify opposition as commonly understood, they are not limits of it.

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against

24

> an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory [or retaliatory] reasons. *Cf. McDonnell, supra*, at 262 (finding employee covered by Title VII of the Civil Rights Act of 1964 where his employer retaliated against him for failing to prevent his subordinate from filing an EEOC charge). There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

*Crawford*, 555 U.S. at 277-78, 129 S. Ct. at 851 (emphasis added).

Additionally, the Supreme Court clarified in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997), "that former employees [like Officer Young] are included within [Title VII's] coverage [prohibiting retaliation]." *Id.* at 346, 117 S. Ct. at 849. Further, Mr. Jones could have had an objective reasonable belief that what Captain Benefield instructed him to do was an unlawful employment practice, *i.e.*, retaliatory against Officer Young under *Burlington Northern*'s material adversity standard. *See id.*, 548 U.S. at 63, 126 S. Ct. at 2412 ("An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." (emphasis in original) (citing *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (10th Cir. 1996) ("finding actionable retaliation where employer filed false criminal

charges against former employee who complained about discrimination”))).

The City relies upon *Brush v. Sears*, 466 F. App'x 781 (11th Cir. 2012), and contends that Mr. Jones's opposition-based retaliation claim falls within the "manager rule." "In essence, the 'manager rule' holds that a management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected activity.'" *Brush*, 466 F. App'x at 787 (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996)); *id.* (concluding differently from other courts that *Crawford* did not foreclose applicability of the "manager rule" because "[i]t did not address whether a disinterested party to a harassment claim could use that harassment claim as its own basis for a Title VII action").

To the extent that the Eleventh Circuit decides to apply the "manager rule" in a binding decision, the facts of this case are significantly distinguishable. In particular, *Brush* involved a plaintiff claiming retaliatory discharge on the basis that she had "disagree[d] with the way in which Sears conducted its internal investigation into [another employee's] allegations [about sexual harassment and rape]." 466 F. App'x at 786. Thus, "Ms. Brush was neither the aggrieved nor the accused party in the underlying allegations. Instead, she was one of the Sears employees tasked with conducting the internal investigation." *Id.*

Unlike the *Brush* plaintiff, what Captain Benefield asked Mr. Jones to do–anonymously reporting an affair to Officer Young's husband–was not part of an investigation into Officer Young's claims or within the scope of any other ordinary managerial action. Instead, Captain Benefield's instruction to Mr. Jones was purely driven by a desire to give Officer Young some painful payback for filing her Title VII lawsuit. Further, Mr. Jones was far from a disinterested party to the retaliatory scenario proposed by Captain Benefield. Thus the manager rule, if ever formally adopted by the Eleventh Circuit, would not apply to the facts of this case and, Mr. Jones has satisfied the first *prima facie* element of his opposition-based retaliation claim.

Because the court finds that Mr. Jones's falsely-reporting-an-affair facts satisfy protected activity under the opposition clause, it does not reach the more doubtful issue of whether Mr. Jones has additionally shown cognizable protected conduct "when he told [Captain] Benefield that [Officer] Young's claims were factual regarding [her] being treated less favorably than [Officer] Horn", as suggested in Mr. Jones's opposition brief. (Doc. 24 at 27). Also, to the extent that Mr. Jones's complaint contains a participation-based retaliation claim premised upon his support of Officer Young's lawsuit in the form of agreeing to be listed as a favorable witness in her case, the court finds that he has abandoned that claim on summary judgment.

27

More specifically, in opposing the City's argument that he lacked cognizable protected activity, Mr. Jones identifies only two examples of protected conduct–(i) his refusal to contact Officer Young's husband and falsely report to him that she was having an affair and (ii) his opinion expressed to Captain Benefield that Officer Young's claims of gender discrimination had factual merit. (Doc. 24 at 26, 27). *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as

a ground for summary judgment"); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint). Thus, the City's Motion is **GRANTED** as to any claim of retaliation premised upon Mr. Jones's willingness to participate as a witness for Officer Young in her Title VII lawsuit.

### 2.     Mr. Jones Has Shown Sufficient Causation.

Mr. Jones also has adequate proof of causation. "To establish that causal connection, a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)). "[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (citing *Clover v. Total System Services*, 176 F.3d 1346, 1354 (11th Cir. 1999)). In its brief, the City contends that "it is undisputed Jones's protected activity did not become known until 1/31/13." (Doc. 19 at 20).

In opposition, Mr. Jones points to Captain Benefield as the person within the decision-making process who was first aware of his protected conduct–opposing

reasonably perceived retaliatory conduct–in or around December 7, 2012, when he resisted Captain Benefield's demand to contact Officer Young's husband and falsely report to him that she was having an affair. Mr. Jones testified that he was concerned about his job after having that exchange with Captain Benefield. AAF No. 16; (*see also* 18-2 at 41 at 160 (Mr. Jones's responding that he first feared retaliation "when he[, *i.e.*, Captain Benefield] started talking to [him] about how he had covered for [him] with [Ms. Scott], and he asked [him] that about [Officer] Young")). Further, there is no evidence to show that Captain Benefield was contemplating a recommendation that Mr. Jones should be fired if he did not end his relationship with Ms. Scott <u>before</u> December 7, 2012.

This differing factual pattern means that the causation holding in *Jackson v. City of Homewood*, No. 2:13-CV-00737-AKK, 2015 WL 5011230 (N.D. Ala. Aug. 24, 2015) and the other similar cases upon which the City relies (Doc. 19 at 18-20) are inapplicable. *Cf. Jackson*, 2015 WL 5011230, at *9 ("Jackson wants the court to allow him to create causation based on his decision to file a charge <u>after</u> learning about his pending discipline and his voluntary decision to inform Chief Roberson about this charge.") (emphasis added); *id.* ("The court declines to do so because it would result in Jackson having veto power over HPD's personnel decisions."); *cf. also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a

retaliation case, when an employer contemplates an adverse employment action <u>before</u> an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." (emphasis added) (citing *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006))); *Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 950 (11th Cir. 2005) ("Here, the evidence shows that Saffold's supervisor contemplated terminating Saffold <u>prior</u> to receiving the EEOC charge.") (emphasis added); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) ("Where timing is the only basis for a claim of retaliation, and <u>gradual adverse job actions began well before</u> the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") (emphasis added). Therefore, Mr. Jones has cleared the initial causation hurdle argued by the City.

However, the City also contends that Captain Benefield was without any power to fire Mr. Jones and that any chain of causation was broken by Mayor Rooks's independent role in the process. As substantiated by the City in the parties' supplemental briefing, Mayor Rooks, pursuant to Ala. Code § 11-43-81,[14] was the

---

[14] Ala. Code § 11-43-81 provides:

The mayor shall be the chief executive officer, and shall have general supervision and

person with the legal authority to fire Mr. Jones. (*See* Doc. 32 at 8 ("The City of Heflin is a Class 8 municipality, and, as such, the Mayor [Rooks] has the authority to terminate Jones'[s] employment, [Captain] Benefield does not." (citing Ala. Code § 11-43-81))). When Mayor Rooks first became involved in the decision-making process and met with Mr. Jones, Ms. Scott, and Captain Benefield, on January 9, 2013, the record does not show that he possessed any knowledge about Mr. Jones's opposition-based retaliation claim:  (i) that he had engaged in protected conduct in early December 2012 when dealing with Captain Benefield and (ii) that Captain Benefield's recent recommendation to discharge him from the force unless he ended his relationship with Ms. Scott was a retaliatory act connected to that protected activity. Mayor Rooks did, however, become aware that Mr. Jones was claiming retaliation on the part of Captain Benefield when he received a copy of the January 31, 2016, letter from Mr. Jones's lawyer on February 1, 2013.

---

control of all other officers and the affairs of the city or town, except as otherwise provided in this title. He shall have the power to appoint all officers whose appointment is not otherwise provided for by law. He may remove any officer for good cause, except those elected by the people, and fill the vacancy caused thereby, permanently, if the appointment of such officer is made by the mayor, and temporarily, if such officer was elected by the council or appointed with its consent, in either of which last two cases he must report such removal and his reasons therefor to the council at its next regular meeting, when, if the council shall sustain the act of removal by the mayor by a majority vote of those elected to the council, the vacancy shall be filled as provided in this title.

*Id.*

Three days later, on February 4, 2013, Mayor Rooks and Captain Benefield met with the City's Personnel Committee to jointly recommend Mr. Jones's dismissal. There is no indication in the record that either Mayor Rooks or Captain Benefield made the Personnel Committee aware that Mr. Jones was claiming that the recommendation to end his employment was allegedly tainted with a retaliatory animus. Further, five days later, Mr. Jones was formally placed on administrative leave by Mayor Rooks on February 6, 2013, and ultimately discharged on March 19, 2013, after the City Council held a termination hearing. A review of the transcript from the termination hearing confirms that the focus of the hearing was whether Mr. Jones had violated HDP policy.

Based upon these facts, the City contends that Mr. Jones's efforts to show cognizable causation by virtue of Captain Benefield's retaliatory recommendation implicitly invokes the cat's paw theory. (Doc. 28 at 9).[15] Sometimes "also referred to as 'subordinate bias theory,' [the doctrine] . . . seek[s] to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.6 (11th Cir. 2013) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 415, 131 S. Ct. 1186, 1190, 179 L. Ed. 2d 144 (2011)). "This theory provides that causation may be established if the

---

[15]   All page references to Doc. 28 correspond with the court's CM/ECF numbering system.

plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory [or retaliatory] animus." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).

"When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory [or retaliatory] animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Stimpson*, 186 F.3d at 1331 (citing *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1248 (11th Cir. 1998)).

In *Sims*, *supra*, the Eleventh Circuit explained in a discrimination case arising under the Age Discrimination in Employment Act ("ADEA"), which like Title VII retaliation uses a but-for standard of causation, that a plaintiff relying upon a discriminatory recommender must have sufficient evidence to show that the recommender's animus was a but-for cause of, or a <u>determinative influence</u> on the adverse action. *See Sims*, 704 F.3d at 1337 ("[A]n ADEA plaintiff must prove

34

'but-for' causation—not mere proximate causation[;] [t]hus, to prevail, Sims must prove that Davis's animus was a 'but-for' cause of, or a determinative influence on, Perkins' ultimate decision."); *id.* ("Assuming *arguendo* that a reasonable juror could find, as set forth in the *Staub* analysis, that Davis was motivated by discriminatory animus that was intended to cause Sims' lay off, we hold that a reasonable juror could not conclude that Davis's [age-related] animus was a 'but-for' cause of Sims' termination.") (footnote omitted).

Here, the circumstances surrounding Mayor Rooks's decision to discharge Mr. Jones based upon Captain Benefield's recommendation is much different than the facts facing the Eleventh Circuit in *Sims*. Importantly, in *Sims*, the evidence of independence from the biased recommender's influence over the decision to fire the plaintiff included the decisionmaker's "own five-month long [reduction-in-force] evaluations," his "own independent judgment that Sims was at the bottom of the list on performance," and "the unanimous opinion of all persons consulted (except for Sims himself)" that he should be fired. *Sims*, 704 F.3d at 1337.

In an effort to prevail on the cat's paw issue, the City states that "Mayor Rooks met with Jones on multiple occasions, and independently investigated the information supporting [Captain] Benefield's recommendation." (Doc. 32 at 8). However, the City's position is conclusory–it gives no concrete examples of Mayor Rooks's

independent actions. Further, several facts support a reasonable inference otherwise. At the onset of his involvement, Mayor Rooks stated that he was not going to override Captain Benefield's requested employment action. Mayor Rooks never met with Mr. Jones without Captain Benefield present. Additionally, Mayor Rooks never personally investigated or asked the Personnel Committee to consider the legitimacy of Mr. Jones's retaliation allegations against Captain Benefield.[16]

Importantly, even after Mayor Rooks became aware on February 1, 2013, that Mr. Jones was claiming retaliation with respect to Captain Benefield's recommendation to fire him if he did not end his relationship with Ms. Scott, Mayor Rooks, without any hesitation, continued to support Captain Benefield's plan by (i) meeting with the Personnel Committee on February 4, 2013, about the recommended discharge of Mr. Jones for violating HPD policy (and without mentioning anything about the possibility of retaliation) and (ii) formally placing Mr. Jones on administrative leave on February 6, 2013.[17] Based upon these facts, a reasonable jury

---

[16] The City takes great issue with the fact that Mr. Jones was unwilling to meet with the Personnel Committee without his attorney also present. However, even if Mr. Jones had agreed to meet without his counsel there, nothing in the record suggests that the purpose of such a meeting would have been to discuss Mr. Jones's retaliation allegations.

[17] Thus, Mr. Jones's case does not mirror the conventional cat's paw construct when the person possessing final decision-making authority has no knowledge of the recommender's purported discriminatory or retaliatory motive at the time of the adverse action. Neither side has cited to any case authority that contains the unusual factual pattern presented here.

could find that Mayor Rooks's merely rubber-stamped Captain Benefield's recommendation when he formally initiated the termination process against Mr. Jones in February <u>without ever exploring the merits of Mr. Jones's retaliation claim even though he had prior written notice of a potential retaliatory reason for the recommendation</u>. *Cf. Llampallas*, 163 F.3d at 1250 ("Thus, Kaylie [*i.e.*, the decisionmaker] was <u>not</u> 'on notice' that Blanch [*i.e.*, the co-employee with a discriminatory motive] could be scheming against Llampallas [to get her fired] based on Llampallas' sex.") (emphasis added).

Further, the court acknowledges but is not persuaded by the City's strained characterization of the Personnel Committee's involvement and the City Council's 5 to 1 post-hearing vote approving Mayor Rooks's decision to fire Mr. Jones as independent intervening acts sufficient to sever any retaliatory causation as a matter of law. (Doc. 32 at 8-10). Importantly, there is no indication that either body ever considered the merits of Mr. Jones's retaliation allegations and/or had the authority to set aside the decision to discharge Mr. Jones. Instead, the narrower inquiry for both was limited to whether Mr. Jones had violated HPD policy as charged. The City Council's lack of independence is further reflected by Mayor Rooks's active control over how the hearing was conducted and his participation in the post-hearing voting process. (*See* Doc. 32 at 5 ¶ 22 ("The following council members voted in favor of

termination: Travis Crowe, Elvin Henson, Shannon Robert[s], Rhonda Green, Mayor Rudy Rooks."));[18] *see also* Doc. 32-1 at 2 (minutes dated March 19, 2013, from City's Special Called Meeting)).

In making this particular lack of causation argument, the City acknowledges the comparable constitutional retaliation case of *Hitt v. Connell*, 301 F.3d 240 (5th Cir. 2002), in which the Fifth Circuit discussed and distinguished the scope of Eleventh Circuit's decision in *Stimpson*, *supra*. The City maintains that this court should not be persuasively guided by the reasoning and outcome in *Hitt*.

The plaintiff in *Hitt* "alleged, and a jury found, that his employment [as a constable] was terminated because [his supervisor, constable] Connell disapproved of Hitt's involvement with two affiliated labor unions . . . ." *Hitt*, 301 F.3d at 244. Further background to the plaintiff's firing by Connell included a supposed "bomb threat" made by the plaintiff to another officer over the telephone. 301 F.3d at 245. After learning about this incident, "Connell delivered a proposed notice of termination to Hitt" writing that "such 'unprofessionalism . . . cannot and will not be tolerated.'" *Id.* Subsequently, "Connell informed Hitt that his employment was terminated. Hitt appealed his dismissal to the Bexar County Civil Service

---

[18]    The City's letterhead (Doc. 18-16 at 2) and official municipal website–http://www.cityofheflin.org/council.html–reflects "Roberts" instead of "Robert" as the correct spelling.

Commission, but the commissioners who heard the appeal voted to uphold Constable Connell's decision." *Id.*

After losing at trial on the plaintiff's federal claim, Connell contended that the vote by the commission to uphold the plaintiff's discharge meant that "the causal connection between Hitt's constitutionality protected activity and the adverse employment action [wa]s broken . . . ." *Id.* at 247-48; *see also id.* at 246 (5th Cir. 2002) ("[Connell] contends that Hitt's participation in union activity was not a motivating factor in his discharge because the county civil service commissioners (who had no retaliatory animus) actually made the decision or, alternatively, Connell fired Hitt because of the bomb threat.").

As the Fifth Circuit framed the causation issue before it:

It is beyond dispute that the commissioners conducted an independent inquiry into Hitt's discharge and were not motivated by any improper motive. Consequently, if the commission is the final decision-maker, then the causal connection between Hitt's constitutionally protected activity and the adverse employment action is broken, and Connell may not be held liable.

In most "causal connection" cases, the determinative question is whether the discriminatory or retaliatory motive of a subordinate employee may be imputed to the titular decision-maker. *Id.* A decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely "rubber-stamps" the recommendation of a subordinate. This case, however, poses the logically antecedent question how to identify the official decision-maker . . . .

39

*Id.* at 247-48 (citations omitted) (emphasis added).

The court then explained why the "Commission's decision upholding Hitt's termination did not break the causal connection between the protected activity and the adverse employment action[.]" *Id.* at 243.

> Under its governing rules, the commission is authorized to review and approve, reverse or modify an adverse employment decision if an employee elects to appeal it. But the mere authority to review an employment decision is not decisive. <u>The commission became involved as an adjudicative tribunal after Hitt chose to appeal his notice of termination. Its task was to review Constable Connell's decision for conformity with applicable law and regulations,</u> not to initiate Connell's action or generally superintend Connell's employment practices.

> In light of these procedures, Connell's reliance on the Eleventh Circuit's decision in *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999), is misplaced. In that Title VII retaliation case, Stimpson, a police officer, alleged that the City of Tuscaloosa was motivated unlawfully when it fired her. <u>The Eleventh Circuit emphasized three times in its brief opinion that Alabama law unequivocally deprives the city of power to discharge a police officer and that the authority to terminate employment rests solely with a statutorily-created civil service board.</u> *Id.* at 1330, 1331, 1332. <u>*Stimpson* thus held that the City of Tuscaloosa could not be liable for retaliation because the civil service board was, as a matter of law, the actual decision-maker, and there was no evidence that the board was a mere conduit for the city's supposed discriminatory motive.</u>

> Just as clearly, the Bexar County Civil Service Commission did not assume final decisionmaking authority. The commission did not *finalize* a decision that Constable Connell had merely recommended or proposed. Although the commission did conduct its own review of Hitt's termination, <u>it did so in a quasi-judicial capacity.</u>

*Hitt*, 301 F.3d at 248-49 (emphasis by underlining added); *see also Stimpson*, 186 F.3d at 1332 ("We need not announce a bright line at which an independent investigation becomes a rubber stamp to resolve this case, because the record before us does not contain any hint of a cat's paw arrangement."); *Quinn v. Monroe Cty.*, 330 F.3d 1320, 1327 (11th Cir. 2003) ("*Stimpson* thus held that the city [of Tuscaloosa] could not be held liable for retaliation because <u>the civil service board was, as a matter of law, the actual decisionmaker</u>, and there was no evidence that the board was a mere conduit for the city's supposed discriminatory motive.") (emphasis added).

Here, this court finds that the City Council's termination hearing is more akin to the quasi-judicial review done by the civil service commission in *Hitt* than the civil service board's three-day comprehensive hearing in *Stimpson*. In the City's supplemental briefing, for example, it does not claim to be organized like the City of Tuscaloosa with a free-standing civil service board that has "the sole power and discretion to terminate police officers[.]" *Stimpson*, 186 F.3d at 1332. Instead, the City refers to Ala. Code § 11-43-81 as the statutory basis giving <u>Mayor Rooks</u> the sole authority to fire Mr. Jones. Additionally, the City does not reference any promulgated "rule [providing] that no employment decision becomes final until approved by the [City Council]." *Hitt*, 301 F.3d at 248. Further, as the hearing

transcript confirms, Mr. Jones's counsel encountered resistance and commentary from Mayor Rooks when he tried to ask some questions that related to retaliation during the termination hearing before the City Council. (*See, e.g.*, Doc. 18-19 at 12 at 43 ("MAYOR ROOKS:  The retaliation, that's what he seems to think that brought all this on, and I fail to see that. You know, you could put any police chief in that chair there and the facts are what they are.")); *cf. Stimpson*, 186 F.3d at 1332 n.2 ("We curiously note that Stimpson apparently never mentioned any discriminatory motive behind the charges at her hearing before the Civil Service Board."); *id.* ("It seems like that would have been an ideal time and place to do so.").

The only appreciable way that the City distinguishes Mr. Jones's case from *Hitt* is in the applicable causation standard. As the City states, "the plaintiff [in *Hitt*] was required only to show that his protected activity was a 'substantial or motivating factor' in the adverse employment action, a standard which is far less strenuous than the 'but-for' standard in the case at hand." (Doc. 32 at 9-10). While the City is correct about this statement of law, *Hitt* does not reflect that a less demanding causation standard made a difference when deciding whether the plaintiff's evidence was sufficient to show discriminatory causation–the civil service commission's review in *Hitt* did not break the chain of causation because the motivating-factor standard applied, but rather because that body lacked any indicia of actual final decision-

42

making authority. The same is true of the City Council here. Moreover, under *Sims*, *supra*, a plaintiff is not precluded from invoking the cat's paw theory under but-for causation cases within the Eleventh Circuit even though the determinative influence standard is a more demanding one to prove. In sum, the court adheres to the cat's paw permission granted in *Sims*, disregards the causation reasoning in *Stimpson* as inapplicable on these facts, adopts *Hitt* as persuasive authority, and concludes that Mr. Jones has adduced sufficient evidence for a jury to decide whether Captain Benefield's retaliatory animus had a determinative influence on Mayor Rooks's decision to fire Mr. Jones.

### B.    Mr. Jones Has Shown Sufficient Evidence of Pretext.

The City has undoubtedly articulated a legitimate reason for firing Mr. Jones–his refusal to end his relationship with Ms. Scott, a convicted felon, in violation of HPD policy. Given this non-retaliatory reason for Mr. Jones's firing, the City alternatively argues that his case fails at the pretext stage.

The Supreme Court has made it clear that "[a] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000); *id.* at 140, 120 S. Ct. at 2105 (granting

certiorari "to resolve a conflict among the Courts of Appeal" that *Hicks* held a plaintiff must show not only the falsity of the employer's explanation, but also "that discrimination [or retaliation] was the real reason" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993))).[19] Thus, the City's insistence that this court apply the pre-*Reeves* approach as the proper standard for evaluating pretext is simply wrong <u>and has been so for over sixteen years</u>. (Doc. 19 at 21-22); (Doc. 28 at 10).

Instead, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination [or retaliation]." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (citing *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106). A plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (internal quotation marks omitted) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S. Ct. 1195, 1197, 163 L. Ed.2d 1053 (2006)).

---

[19] Sometimes referred to as the "pretext-plus" standard.

Mr. Jones's evidence of pretext includes his testimony that Captain Benefield was aware of and did not have any problems with Mr. Jones's relationship with Ms. Scott, despite her criminal record, when Mr. Jones was hired. As Mr. Jones testified about the information that he shared with Captain Benefield during the summer of 2010:

> I explained to him[, *i.e.*, Captain Benefield] the issues of leaving the ABC Board. And I wanted to be sure that that wasn't going to be an issue, and he and I, with our history, we had no secrets from each other, and he assured me that it would not. . . .
>
> [B]efore he ever did my background -- he went to ABC and did my background in person.
>
> When we were on the way to get my uniforms, about a week or two weeks before I actually started to work -- I can't remember the exact time -- I know exactly where we were -- I was -- I told him the extent of her history, that she had been arrested for theft first, and I told him about the check on the car. We were on Highway 78, right where 431 comes in.

(Doc. 18-2 at 18 at 66-67). In another part of his deposition, Mr. Jones similarly testified:

> [W]hen I got my uniforms, I told him[, *i.e.*, Captain Benefield] about her[, *i.e.*, Ms. Scott] theft first charge with the stolen ve- -- (witness demonstrating) -- stolen vehicle, the bad check/vehicle, we -- we talked about that. And I -- he asked me, specifically, that day, he said, is she in any trouble now or under investigation. I said, no. And she's not, nor has she been.

(Doc. 18-2 at 37 at 143-44).

While Captain Benefield disputes that this conversation about Ms. Scott's criminal history ever took place or that he otherwise ever had any prior knowledge of Ms. Scott's felony convictions, Mr. Jones has offered a non-party witness that corroborates Captain Benefield's awareness of this fact in 2010. More particularly, Tim Gossage ("Mr. Gossage"), a retired Chief Deputy of the Cleburne County Sheriff's Department, has provided an affidavit indicating that he "was present at a meeting" in 2010 with Captain Benefield, Mr. Jones, and the City's then chief of police. (Doc. 25-1 at 2). Mr. Gossage brought up at the meeting that Mr. Jones "was living with a convicted felon, Connie Scott, and [in his opinion] this did not appear well with the public." *Id.* In response, Mr. Gossage recalls that Captain Benefield stated "he did not know about this but he would investigate" and that "this would not be tolerated at the Heflin Police Department." *Id.*

Oftentimes sufficient pretext is shown by comparing how a supervisor has treated similarly situated subordinates (*i.e.*, who violated the same rule or policy, but who did not oppose discriminatory or retaliatory practices) more favorably than the plaintiff. *See, e.g., Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) ("[T]he 'work rule' defense is arguably pretextual when a plaintiff submits evidence . . . that if []he did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."). Mr.

Jones lacks this type of evidence.

At the same time, and if his evidence is believed, Mr. Jones has presented an example of dissimilar treatment that is analogous to the customary comparator-evidence construct–his ongoing and known violation of HPD policy because of his relationship with Ms. Scott was a non-issue for Captain Benefield until he refused to engage in a retaliatory act against Officer Young.[20] Further, only then did Captain Benefield recommend to Mayor Brooks that Mr. Jones be fired for violating that HPD policy unless he broke up with Ms. Scott. While the court has endeavored to find a case that has either embraced or rejected this type of individualized inconsistent treatment by a supervisor as adequate evidence of pretext in a retaliation case, it has not been able to locate one. The authorities cited by the parties offer no helpful insight either.

At the same time, this peculiar selective-enforcement evidence straightforwardly discredits or makes implausible the City's stated reason for discharging Mr. Jones–if the City truly had a "zero-tolerance" approach when dealing

---

[20] In its reply brief, the City cites to several decisions that reflect the Eleventh Circuit's willingness to "afford police departments . . . greater latitude to burden an employee's rights that impact discipline, morale, harmony, uniformity, and trust in the ranks." (Doc. 28 at 10-11; id. at 10 n.15). The court does not disagree with the City's observation about the import of those various Eleventh Circuit holdings. However, the issue in this lawsuit is not whether the HPD policy is legitimate or constitutional, but rather whether Mr. Jones has sufficient evidence for a reasonable jury to decide that the HPD policy was enforced against him in a retaliatory manner.

with associational violations of the HPD policy (as Mr. Gossage's affidavit indicates Captain Benefield pronounced when reacting to the report in 2010 that Ms. Scott was a felon), then Mr. Jones never should have been hired by the City in the first place, or, alternatively, Mr. Jones should have been fired in 2010 after the meeting involving Captain Benefield and Mr. Gossage occurred. *Cf. E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003) ("Kohler's lax enforcement of company policy and disciplinary procedures provided additional evidence from which a jury could have found retaliatory motive.") (emphasis added).[21]

Additionally, the dissimilar treatment he received pre-opposition versus post-opposition is not Mr. Jones's sole source of pretext. *Cf. Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination [or retaliation] is present.") (emphasis omitted). He also has evidence that circumstantially reflects Captain Benefield's retaliatory animus, including his desire to have Officer Young feel some pain because of the suffering she caused him and his family from her Title VII lawsuit, his related command to have Mr. Jones lie to her husband in order to cause her some pain, and his warning that he had been

---

[21] Unlike Mr. Jones, the *Kohler* plaintiff had several comparator witnesses. 335 F.3d at 775-76.

covering for Mr. Jones on his relationship with Ms. Scott. *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) ("We have said, however, that such [indirect] comments can *contribute* to a circumstantial case for pretext.") (emphasis in original); *cf. Vessels*, 408 F.3d at 771 ("Vessels' evidence of pretext includes statements he claims that AISS officials made regarding the desirability of having black employees in a school system serving a predominantly black population."); *id.* ("Even where such evidence of race [or retaliatory] bias proves insufficient to prove an employee's case through direct evidence, it can be relevant in the circumstantial framework to show that the employer's proffered reasons were pretextual." (citing *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291) (11th Cir. 1998)); *cf. also Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729-30 (11th Cir. 1999) ("While Daniel's [age-related] comment does not rise to the level of direct evidence of discrimination, and would not be enough standing alone to show a discriminatory motive, a jury could infer from it some age-bias on Daniel's part when that comment is coupled with the other evidence in this case." (citing *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997))).

Therefore, based on the combined weight of the foregoing pieces of evidence, the court concludes that Mr. Jones has adduced sufficient evidence of pretext. Alternatively, to the extent that the above evidence does not satisfy the conventional

*McDonnell Douglas* framework, the court finds that Mr. Jones has, nonetheless, "present[ed] circumstantial evidence that creates a triable issue concerning the [City's retaliatory] intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citing *Holifield*, 115 F.3d at 1562); *Smith*, 644 F.3d at 1328 ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination [or retaliation] case."); *see also Ortiz v. Werner Enterprises, Inc.*, No. 15-2574, __ F.3d __, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016) ("That legal standard, to repeat what we wrote in *Achor* and many later cases, is <u>simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action</u>.") (emphasis added); *Ortiz*, 2016 WL 4411434, at *4 (overruling *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011), and other cases "to the extent that they rely on 'convincing mosaic' as a governing legal standard").

"The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993); *see also MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (This court must determine

whether the record contains "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998))). Here, "[t]he evidence presented by plaintiff[] is sufficient to allow a jury in the exercise of impartial judgment to conclude that [the City's] proffered explanations are unworthy of belief." *MacPherson*, 922 F.2d at 776. Alternatively, a reasonable jury could equally conclude that the City's articulated reason for firing Mr. Jones–because of his relationship with Ms. Scott that violated HPD policy–is legitimate and not a pretext for retaliation under Title VII.

## C. The Inchoate Evidentiary Issues Raised by the City in its Reply Brief Do Not Change the Outcome on Summary Judgment.

The court acknowledges that, within its reply brief the City, citing to *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007))), argues that the court "should strike all of [Mr.] Jones's deposition and affidavit testimony that he allegedly told [Captain]

Benefield about [Ms.] Scott's felonies long before December 2012." (Doc. 28 at 4). The City also seeks to strike Mr. Gossage's affidavit on the basis that Mr. Jones did not timely disclose him as a witness and "the late tender of [him]" violates Rule 37(c)(1) and the parties' scheduling order. *Id.*

Procedurally, the court is not obligated to take up either one of these buried and undeveloped evidentiary issues, given the City's failure to file a motion that would have unambiguously put the court and opposing counsel on notice of a <u>seriously contested</u> evidentiary dispute and that would have been briefed by <u>both</u> sides under Appendix III to the court's uniform initial order. Additionally, the court is not persuaded by the merits of the City's contentions under the framework of Rule 37(c)(1):

> **(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, <u>unless the failure was substantially justified or is harmless</u>. In addition to <u>or instead of this sanction</u>, the court, on motion and after giving an opportunity to be heard:
>
> > **(A)** may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> >
> > **(B)** may inform the jury of the party's failure; and
> >
> > **(C)** may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

FED. R. CIV. P. 7(c)(1) (emphasis by underlining added).

Turning to Mr. Gossage's affidavit first, the City faults Mr. Jones for not providing any justification for waiting to disclose Mr. Gossage as a material witness. (Doc. 28 at 4). If the City had properly filed a motion, then Mr. Jones would have been required to explain his position for tendering such a late witness under the briefing requirements of Appendix III. However, the court is unwilling to simply assume in the City's favor that Mr. Jones lacks substantial justification without first being given an opportunity to respond to the City's claim on the record.

As for the "harmless" exception to Rule 37(c)(1), the City's claim of harmful error caused to it by not being able to depose Mr. Gossage is dubious–the City could have sought to reopen discovery for the limited purpose of taking Mr. Gossage's deposition, but it never did. Instead, it chose to passively assert in a reply brief that the court should simply ignore Mr. Gossage's affidavit because the discovery completion deadline had expired. Further, the City has not explained how by merely taking his deposition, Mr. Gossage's testimony would have been any different than the contents of his affidavit. Therefore, because the City could have taken proactive steps to undo any of the harm about which it now complains and the City has not shown how taking Mr. Gossage's deposition would have materially changed his testimony, the court is not inclined to find that Mr. Jones, by failing to identify Mr.

Gossage earlier, violated Rule 37(c)(1) or the scheduling order to a degree that exceeds harmless error.

Finally, Rule 37(c)(1) allows a court to fashion a lesser sanction than precluding a witness's testimony even if the two exceptions do not apply. For example, if the City had sought to reopen discovery for the limited purpose of taking Mr. Gossage's deposition, the court could have ordered Mr. Jones to cover all the fees and costs incurred on account of that deposition. For all these reasons, the City's requested relief under Rule 37(c)(1) is **DENIED**.

Concerning Mr. Jones's challenged testimony, the court finds that the City has not met *Scott*'s blatantly-contradicted standard. To the extent that the tape-recorded conversations are in conflict with Mr. Jones's testimony that Captain Benefield was aware of Ms. Scott's criminal history before he was hired, the jury will have to sort out those credibility issues. Alternatively, even without Mr. Jones's testimony about Captain Benefield's prior knowledge of Ms. Scott's criminal history, Mr. Gossage's affidavit creates a material issue about this critical fact. In sum, for both procedural and substantive reasons the evidentiary issues superficially presented in the City's reply brief are all **DENIED**. Alternatively, the evidentiary contention relating to Mr. Jones's testimony is **TERMED** as **MOOT**.

V.     **CONCLUSION**

The City's Motion is **GRANTED** as to any claim of retaliation premised upon Mr. Jones's willingness to participate as a witness for Officer Young in her Title VII lawsuit and otherwise is **DENIED**. Further, the City's evidentiary challenges raised in its reply brief are **DENIED**. Alternatively, the evidentiary contention relating to Mr. Jones's testimony is **TERMED** as **MOOT**. By separate order, the court will set this case for a final pretrial conference.

**DONE** and **ORDERED** this the 19th day of September, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge